IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FRANK,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>WILBUR-ELLIS COMPANY SALARIED EMPLOYEES LTD PLAN and LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>　　　　　Defendants.<br>_____ / | CASE NO. CV F 08-284 LJO-GSA<br><br>**TRIAL DECISION** |

## INTRODUCTION

In this ERISA[1] action, plaintiff James R. Frank ("Mr. Frank") seeks reinstatement and future payment of long-term disability ("LTD") benefits under a policy purchased by Mr. Frank's employer Wilbur-Ellis Company. Mr. Frank seeks $23,364 for withheld LTD benefits, future $1,013 monthly benefits up to July 2013, and payments made for life insurance premiums. Defendants Life Insurance Company of North America ("LINA") and Wilbur-Ellis Salaried Employees LTD Plan ("Plan") (collectively "LINA") contend that Mr. Frank is not entitled to continuing benefits because he is no longer "disabled" within the meaning of the Plan. This Court conducted a de novo review bench trial, pursuant to Fed. R. Civ. P. 52(a). For the reasons discussed below, this Court overturns LINA's determination that Mr. Frank was ineligible for LTD benefits, orders LINA to reinstate Mr. Frank's benefits, and awards Mr. Frank the amount of withheld LTD benefits, paid life insurance premiums, and future monthly LTD benefits subject to his continuing disability eligibility under the Plan.

---

[1] The Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., to render Mr. Frank's claims subject to ERISA.

## STANDARD OF REVIEW

Pursuant to ERISA, Mr. Frank is entitled to a bench trial on the administrative record. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398 (1999); *see also, Neumann v. Prudential Ins. Co. of America*, 367 F. Supp. 2d 969 (2005) (bench trial on paper is appropriate procedure for de novo review of ERISA LTD benefits claim). In a trial without a jury, Fed. R. Civ. P. 52(a) requires a court to find the facts specially and state separately its conclusions of law thereon. *Barnett v. Sea Land Service*, 875 F.2d 741, 744 (9th Cir. 1989). Findings of fact must be sufficiently comprehensive and pertinent to issues to provide a basis for the decision, and must be supported by the evidence. *Zimmerman v. Montour R. Co.*, 296 F.2d 97 (3rd Cir.), *cert. denied*, 369 U.S. 828 (1961). This Court need only make findings of fact that are relevant to the judgment. *Nuelsen v. Sorensen*, 293 F.2d 454 (9th Cir. 1961).

The parties stipulated that this Court shall review de novo whether Mr. Frank is disabled within the meaning of the Plan. "De novo is the default standard of review" by which a "court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). In an ERISA case such as this, a district court asks "not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record...the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney*, 175 F.3d at 1095. Upon review, due regard is given to the district court's judgment as to the credibility of the witnesses. Fed. R. Civ. P. 52(a). Courts of Appeal give deference to a district court's choice between two permissible views of evidence, provided it is not clearly erroneous. *Moody v. Proctor*, 986 F.2d 239, 241 (8th Cir. 1993).

## FINDINGS OF FACT

### The Plan

1. Wilbur-Ellis Company purchased group disability and life policies which are part of the Plan and which were issued by LINA. LINA administers claims under the Plan, including benefits eligibility. Mr. Frank participated in the Plan and was eligible for LTD and life insurance benefits.

///

2

**Definition of "Disabled"**

2. Under the Plan, a participant qualifies as "disabled" if his or her condition rendered him or her unable to earn more than 80% of his or her Indexed Covered Earnings. After disability benefits have been payable for 24 months, a person remains "disabled" if his or her injury makes him or her unable to perform all of the material duties of *any occupation* for which he or she may reasonably become qualified based on education, training or experience ("any occupation provision"), or solely due to injury, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings. Administrative Record ("AR") CD 21.

3. As discussed below, Mr. Frank received LTD benefits for approximately six years before LINA determined he was no longer "disabled." Accordingly, Mr. Frank was subject to the any occupation provision at the time of the ineligibility determination.

**Mr. Frank's Disability**

4. Wilbur-Ellis Company employed Mr. Frank, age 51, as an agricultural salesman during 1981-2000. In May 2000, Mr. Frank suffered a right knee injury that required reconstructive surgery. Mr. Frank claimed disability based on his right knee injury and resulting problems. LINA determined that Mr. Frank was disabled as a result of the work-related injury and paid Mr. Frank LTD benefits effective May 29, 2000 through September 2006. Mr. Frank also received Social Security disability benefits which LINA offset against his LTD benefits.

5. During the time Mr. Frank received LTD benefits, he was subject to annual reviews for continued eligibility. LINA never sought or obtained an independent medical evaluation of Mr. Frank. LINA relied solely on the medical records and opinions obtained from Mr. Frank's treating physicians to monitor and confirm his on-going disability status. For his conditions, Mr. Frank treated with orthopedic surgeon Malcolm Ghazal, M.D. ("Dr. Ghazal"), and hematologist and oncologist L. Thomas Hackett, M.D. ("Dr. Hackett").

6. By February 2002, Mr. Frank had undergone surgical procedures on both knees. Throughout the relevant time period, Mr. Frank was treated for right knee orthopedic problems and arthritis, coagulopathy and chronic venous insufficiency due to recurrent deep venous thrombosis, and chronic pain. According to his medical records, Mr. Frank was also diagnosed with melanoma.

7.      At no time prior to 2006 did LINA receive any medical information indicating that Mr. Frank's disability status had changed to render him ineligible for continuing LTD benefits. Dr. Ghazal reported Mr. Frank "disabled" in 2001 (AR 447, 445, 448, 444, 442, 441) and 2002 (AR 432). In 2003, Dr. Ghazal reported that Mr. Frank was "heavily reliant on his right leg brace," suffered "ongoing weakness," and that his right knee would give out at "least a couple times a week." AR 165-66. In May 2003, Dr. Ghazal reported that Mr. Frank "remains disabled which is...a permanent situation." AR 161-63. In November 2003 report, Dr. Ghazal again reported that Mr. Frank is "permanently disabled." AR 423. An April 2004 Physical Ability Assessment ("PAA") signed by Dr. Ghazal indicates that Mr. Frank is unable to stand, walk, lift, carry any weight, stoop, balance, kneel, crouch or crawl. Dr. Ghazal's May 2004 report recommends the Plan "continue with temporary total disability with a recheck in one year." In April 2005, Dr. Ghazal reported that Mr. Frank could not lift or carry any weight, could occasionally push and pull 2 lbs., could not climb stairs or ladders, balance, stoop, kneel, crouch, or crawl. AR 352, 353. In addition, Dr. Ghazal reported that Mr. Frank did not have the ability to work extended shifts or overtime and could not use his lower extremities for foot controls. AR 353. *See also*, AR 160.

**February 2006 Supplemental Report**

8.      In January 2006, LINA sent Mr. Frank a Supplementary Claim Form of Disability, and directed Mr. Frank to have his attending physicians complete the form and return it.

9.      A February 8, 2006 supplemental claim form ("February 8 Supplement") that appears to be signed by Dr. Ghazal notes that Mr. Frank was "improved" and "ambulatory." AR 173. According to the February 8 Supplement, Mr. Frank was a suitable candidate for further rehabilitation, he could work at "medium manual activity (15-30% [physical impairment restriction])," his "present job" could be "modified to allow for handling with impairment," and could return to work on March 1, 2006. AR 174.

10.     LINA claim manager Israel Piotter ("Mr. Piotter") called Dr. Ghazal's office to confirm that Mr. Frank could return to work, as indicated on the February 8 Supplement. AR 67. According to Mr. Piotter's notes, Dr. Ghazal's secretary informed Mr. Piotter that Dr. Ghazal's physician assistant ("PA") completed the February 8 Supplement form and referred Mr. Piotter to the PA. *Id*. Mr. Piotter called Mr. Frank on March 5, 2006 to inform him that his doctor confirmed to LINA that Mr. Frank has the "ability to work at medium/manual activity level" and that he was to return to work on March 1, 2006.

*Id*. The next day, Mr. Piotter spoke with Dr. Ghazal's PA, Deep. According to Mr. Piotter's notes, "Deep indicate [sic] to me that [Mr. Frank's] RTW is correct and that he can perform work at a medium/manual activity, the left leg artscopey was confirmed as the present condition." *Id*.

11.     Subsequently, Dr. Ghazal's office informed Mr. Piotter that the February 2006 examination and supplemental claim form referred to Mr. Frank's left knee, rather than his right knee. In a letter to Mr. Piotter, dated March 7, 2006, "Miranda S." wrote:

> As we discussed on the phone on March 7, 2006, please accept this as notice that our office recently submitted disability paperwork for patient James Frank. Unfortunately, the paperwork was filled out regarding his left knee and it should have been regarding his right knee. I have attached the patient's medical file on his right knee and hope this will be sufficient for the mistake. Please let me know if there is any other information you need from our office.

AR 159. According to Mr. Piotter's notes, Dr. Ghazal's office "confiremd [sic] that the [sic] did the examination on the wrong knee and the last APS which indicates RTW, is incorrect. At this time they will be sending me corrected and new information re garding [sic] [Mr. Frank's] disability." AR 65.

12.     Based on uncontradicted and undisputed evidence, including Mr. Poitter's notes of his conversations with Dr. Ghazal's office and the Miranda S. Letter, this Court finds that the February 8 Supplement was filled out by Dr. Ghazal's PA, was based on an examination of the wrong knee, and referred to the wrong knee. Subsequently, Dr. Ghazal's office acknowledged the mistake and informed LINA that the February 8 Supplement recommendation that Mr. Frank could return to work was *incorrect*. Accordingly, this Court gives little weight to the February 8 Supplement to determine whether Mr. Frank is disabled based on his right knee injury.

### June 2006 Annual Review

13.     In connection with its 2006 annual review of Mr. Frank's disability eligibility, LINA requested medical information from Mr. Frank's treating hematologist, Dr. Hackett, and his treating orthopedist, Dr. Ghazal. In April 2006, LINA sent each treating physician a PAA form that identified Mr. Frank by name and date of birth. In addition to requesting a medical opinion concerning the patient's limitations and restrictions ("L&Rs"), the form directed the reporting physician to state a diagnosis and ICG-9 Code.

14.     After not receiving the printed PAA from Dr. Ghazal's office, LINA sent Dr. Ghazal another, blank PAA. In return, LINA received a June 26, 2006 PAA ("June 26 PAA") bearing Dr. Ghazal's

signature. AR 106. The June 26 PAA, however, is blank in the areas for patient name, date of birth and diagnosis. AR 107. According to the June 26 PAA, the *unidentified* patient is able to: (1) balance and lift/carry 10-20 pounds continuously; (2) sit continuously for "5.5+" hours; (3) stand, stoop and walk frequently; and (4) carry 21-50 pounds, climb stairs and ladders, and work overtime occasionally. *Id*.

15. For a number of reasons, this Court gives little weight to the June 26 PAA as evidence of Mr. Frank's ability or disability. First, the June 26 PAA fails to identify Mr. Frank. LINA provides no credible evidence that the June 26 PAA relates to Mr. Frank. Second, as discussed below, Mr. Frank provides credible evidence to repudiate the June 26 PAA. In a September 1, 2006 letter, Dr. Ghazal, the alleged author of the June 26 PAA, wrote that he "cannot seem to find paperwork to substantiate" the conclusions of the June 26 PAA. Dr. Ghazal's September 1, 2006 letter explains that the June 26 PAA is erroneous and that Mr. Frank remains disabled. Third, the June 26 PAA is contrary to Dr. Ghazal's March 29, 2006 office notes, in which he opines that Mr. Frank continues to be disabled. LINA provides no evidence to contradict Dr. Ghazal's September 1, 2006 letter or March 29, 2006 office notes. Fourth, the way in which the June 26 PAA form is filled out is inconsistent with prior PAA's, and its conclusions regarding Mr. Frank's abilities is inconsistent with the opinions of Dr. Hackett, as discussed *infra*.

16. Dr. Hackett's April 27, 2006 ("April 27") PAA identifies Mr. Frank by name and date of birth, and indicates a coagulopathy diagnosis, consistent with Mr. Frank's medical records. AR 127. According to Dr. Hackett's April 27 PAA, Mr. Frank is able to sit, stand, walk, push, pull, lift and carry 10 pounds of weight occasionally. AR 127, 128. In addition, Dr. Hackett's April 27 PAA assessed that Mr. Frank cannot climb, balance, stoop, kneel, crouch, crawl, or use lower extremities for foot controls. AR 128.

### Transferrable Skills Analysis

17. Based on Dr. Ghazal's June 26 PAA, Mr. Piotter referred Mr. Frank for a Transferable Skills Analysis ("TSA"). AR 38, 64. Danny Sessums, R.S., CRC, Rehab Specialist ("Mr. Sessums") completed a TSA for Mr. Frank on August 17, 2006. AR 104. In his analysis, Mr. Sessums reviewed "JD, DQ, DOT, OASYS, PAA dated 6/26/2006." Mr. Sessums considered that Mr. Frank's limitations, "per PAA dated 6/26/2006," were:

> **Light Level Physical Demand Category** with limits and abilities as set forth as: **Constant**: sit; **Frequent**: Stand/Walk/Stoop; **Occasional**: Lift/Carry 21-50 pounds, climb kneel, crouch, crawl.

> **Transferable Skills**: Directing, controlling, or planning activities of others, Influencing people in their opinions, attitudes and judgments, Making judgments and decision.

Mr. Sessums' August 17, 2006 TSA concluded that Mr. Frank had transferrable job skills to positions of agricultural sales, mechanical equipment sales and agriculture inspector.

18.     Because the June 26 PAA failed to identify Mr. Frank, and was inconsistent with Dr. Hackett's concurrent medical opinion and Dr. Ghazal's immediate past medical opinions and office notes, Mr. Piotter's reliance on the June 26 PAA for a TSA referral was erroneous.  Mr. Piotter erred in failing to investigate further the June 26 PAA and/or Mr. Frank's L&Rs.

19.     Mr. Sessums' analysis was based on erroneous L&R information contained in the June 26 PAA, that was inconsistent with Dr. Hackett's medical opinion and was subsequently repudiated by Dr. Ghazal. Thus, Mr. Sessums' conclusions based on the erroneous information may be invalid.  The Court affords weight to the TSA accordingly.

20.     Mr. Sessums concluded that Mr. Frank has transferrable skills to the positions of agricultural sales, mechanical equipment sales and agriculture inspector, identified said positions to be "light labor" occupations, but failed to include a description of the positions.  Accordingly, the TSA provides little support for LINA's contention that Mr. Frank qualifies for three "sedentary" occupations.

## Denial of LTD Benefits

21.     Based on Dr. Ghazal's June 26 PAA and Mr. Sessums' TSA, LINA determined that Mr. Frank could perform his occupation and two other occupations and, therefore, "no other objective restrictions listed in his file...support disability." AR 34.  Mr. Piotter wrote an August 25, 2006 letter to inform Mr. Frank that he was ineligible for continued LTD benefits. AR 92-96.  According to the letter, LINA considered Mr. Frank's "claim file as a whole," including information provided by Mr. Frank's treating physicians Dr. Ghazal, Roman Malley, M.D. ("Dr. Malley"), and Mr. Hackett, the results of the June 26 PAA, the results of the TSA, and information provided by Mr. Frank. ER 92-93.

22.     The August 25, 2006 letter notes that on November 10, 2005, Mr. Frank filled out an Activities of Daily Living and Disability Questionnaire ("DQ").  On the DQ, Mr. Frank wrote that he can not return to work because "there is still a lot of pain in" his leg, which requires him to take pain medication "all of the time."  Mr. Frank described the reasons he cannot return to work as follows, in part:

7

> Some days I can get around without any help and other days I can't even get out of bed. I still do a lot of falling while I am trying to walk. The muscles in my leg have deteriorated tremendously. The doctor said I only have about 30% of my strength in the right leg. Because the right leg has been bad for so long the left leg has been supporting the majority of my weight. Now the left leg is going bad because of the added stress. I have to have surgery on the left leg and now I am going through a series of shots for the leg. I can only walk short distances before the right leg begins to swell. If I don't get to my recliner the swelling causes poor circulation, which causes severe cramping in the leg, severe enough to stop any walking. Hot water is all that will relieve the cramping. I can't drive for more than ½ hour without a break because the sitting causes swelling and blood clots. I used to mow my own grass in about 45 minutes, now it takes me over 2 ½ hours. The other day I had to hire a yardman because I can no longer do this chore. It causes too much pain pushing the mower even through I take my time. My doctor has also told me that I have the beginning stages of Alzheimer's. I am taking medication for this, as my memory is becoming very bad. I am also taking several medications daily which keep me somewhat dazed from time to time.

Mr. Frank indicated that he is able to drive, depending on how he feels. Mr. Frank lives in a 2-story house. Mr. Frank uses handrails, a wheelchair and a cane to ambulate. As for skills, training and experience, Mr. Frank has "a high school diploma, four years of college, and a degree in criminology and electronics." Mr. Frank worked in agricultural sales for 20 years.

23.     In his August 25, 2006 letter, Mr. Piotter describes the information LINA considered that was received from Mr. Frank's treating physicians. Mr. Piotter notes the June 26 PAA, as described above. The letter also notes that on March 29, 2006, LINA received Dr. Ghazal's office notes that read:

> Jim is in the office today following up on his right knee allograft with Achilles tendon performed approximately three years ago. He states he continues to have some occasional pain in his knee; however, he is doing fairly well otherwise.
>
> Clinically, he is ambulating with a single point cane with a fairly significant limp. He does have strength of 4-/5 in flexion and extension. Palpation of the knee demonstrates a palpable femoral groove for the patella as he does have patella Baja.
>
> The patient is status post right knee quadriceps repair using Achilles tendon allograft, he has already been declared permanent and stationary.
>
> The patient is to continue with total temporary disability, he will recheck in one years' time.

LINA also reviewed Dr. Ghazal's office notes of 2003, 2004, and 2005, which show treatment and follow up visits for the extensive reconstructive surgery of his right knee.

24.     Mr. Piotter's August 25, 2006 letter reads: "On May 2, 2005 we received office notes from [Dr. Hackett] which show laboratory and test results, treatment of nausea and vomiting, pain, and fatigue." The letter further mentions that Dr. Malley did not respond to LINA's request for documents.

1  25.	The letter informs Mr. Frank that: "With the information provided to us on the Physical Abilities
2 Assessment form completed by Malcolm E. Ghazal M.D., a Transferable Skills Assessment (TSA) was
3 performed to determine if you had transferable skills to perform other occupations." LINA identifies "3
4 sedentary occupations" that Mr. Frank "could perform based on the restrictions provided by your
5 Orthopedic Physician, past training, education and experience." Based on that analysis, LINA concluded:

> Based on the pertinent vocational and medical documentation contained in the file, we have determined that you retain the capacity to perform work in your own occupation and any other occupations based on your current functional limitations, your past training, education, and experience. Therefore, we must deny your claim for Long-Term Disability benefits as of August 23, 2006.

Mr. Piotter informed Mr. Frank that he has the right to submit "any new documentation you wish us to consider" including "physician's office notes, hospital records, consultations, test result reports, therapy notes, physical and/or mental limitations, etc." AR 96.

**Mr. Frank's Appeal**

13  26.	Mr. Frank appealed denial of his continued LTD benefits and life insurance premium waiver.
14  27.	In support of his appeal, Mr. Frank submitted a September 1, 2006 letter written Dr. Ghazal and
15 a September 1, 2006 letter written by Dr. Hackett.
16  28.	Dr. Hackett's letter reads, in part:

> Today I received a copy of the letter that my patient Jim Frank received, that denied him disability benefits. They based it upon the enclosed note. Looking at the limitations that Dr. Malcolm Ghazal stated [in the June 26 PAA], the patient can be disabled, and still be able to do some work with his hands, and still be able to travel to his niece's wedding [to explain Dr. Hackett's April 11, 2006 office notes, described below]. I don't see anything in this note that states this person is no longer disabled, and that he can go back to full time work. This patient has chronic venous insufficiency due to recurrent deep venous thrombosis. He has had numerous knee surgeries. He ambulates with a cane, and has quite marked pain in the knees.

22  29.	In his September 1, 2006 letter, Dr. Ghazal remarked that Mr. Frank "showed me a letter that was sent to him that quoted some things or reports from my office that I cannot seem to find paperwork to substantiate. I would like to bring you up to date with what Mr. Frank's physical abilities truly are." AR 89. According to Dr. Ghazal:

> Mr. Frank is disabled. He is unable to perform any weightbearing activities of any description in a profitable and reliable way. It is unlikely that the status will change. He has two bad knees, one of which has undergone multiple surgical procedures in order to get it to the functional level that it is now and, at that, it is only poorly functional. The other one is documented to be very arthritic and will need to be addressed at some point.

30. In his September 1, 2006 letter, Dr. Ghazal listed the following as current L&Rs for Mr. Frank:

1. It is very difficult to perform weightbearing activities and he is only able to take very short strides.

2. He is in need of a walking aid such as a cane or a walker and sometimes a wheelchair when he fatigues.

3. He cannot carry more than 10 pounds and at that, only for very short distances. Since he is reliant on a walking aid, this only frees up only one hand at best to carry the weight.

4. He is unable to push or pull any weight such as machines, trays, trash cans, etc.

5. He can only ambulate for approximately 50 feet before having to stop and rest.

6. He can only walk on hard and level ground and has an exceptionally difficult time with uneven ground, inclines or declines.

7. When he is weightbearing for any period of time, he has significant swelling of his right leg primarily from his knee to his ankle but also in the right thigh.

8. It is very difficult for him to ambulate up and down stairs, ramps, or steps and he does need help or assistance occasionally.

9. Ingress and egress from vehicles is difficult for him.

10. Handrails are required in tight spaces such as toilets, bathrooms, showers, etc.

11. He complains of constant superior ache in the right leg the preponderance of the time.

12. He finds himself frequently lying down to relieve his pain.

13. He has atrophy of the right leg muscles.

14. He feels unstable with weightbearing activities.

15. He requires help to upright himself when he has fallen.

16. He cannot stoop, kneel, crawl or squat at all.

17. He will be undergoing left knee surgery in January of 2007, as currently scheduled.

31. On September 26, 2006, Mr. Piotter noted in the claim file that Dr. Ghazal had submitted a "list of limitations." AR 22. On October 10, 2006, LINA appeal assignee Troy Phipps ("Mr. Phipps") noted in the claim file that Dr. Ghazal had stated he was unaware of the June 26 PAA and that Mr. Frank is disabled. AR 18.

///

1   32.     Thereafter, LINA neither reopened Mr. Frank's claim, contacted Drs. Ghazal or Hackett, obtained another transferable skill assessment, nor commissioned an independent medical examination of Mr. Frank.

33.     Mr. Poitter sent Mr. Frank a September 26, 2006 letter to inform Mr. Frank that LINA "is in receipt of your request for a review of the decision to deny benefits." AR 82.  In that letter, Mr. Piotter informs Mr. Frank that during "the course of this review, it may be necessary to request additional information in order for us to make our decision." In Mr. Piotter's October 20, 2006 letter, LINA informs Mr. Frank that it "will consider any additional relevant information which supports your Disability. However, it is your responsibility to provide this information to us by November 15, 2009, or our decision may be based on the available information." AR 80.

**Denial of Appeal**

34.     LINA medical director Scott C. Taylor, D.O. ("Dr. Taylor"), completed a December 29, 2006 file review for Mr. Frank's appeal. AR 79.  Dr. Taylor summarizes the reasons for denial as follows:

> Core team denied claim ongoing A/O 9/23/06 after PAA-6/26/06 tabbed completed by Dr. Ghazal-ortho indicated CX could perform light duty.  Core team performed a TSA and identified H/O as well as 2 other light duty occupations CX can perform.  CX has appealed submitting a Memo from Dr. Ghazal stating he is unaware of the PAA and states CX is disabled.  CX also submitted a memo from Dr. Hackett-oncl-IM stating CX is disabled ambulates with cane has chronic venous thrombosis, numerous knee surgeries.  PAA-4/27/06 from Dr. Hackett indicates sedentary capacity. 4/11/06-O/N states CX is doing well working out in barn and was doing some pruning.

35.     In his review of the appeal, Dr. Taylor noted that he considered the following: (1) Dr. Ghazal's February 8 Supplement; (2) Dr. Hackett's April 11, 2006 office notes; (3) Dr. Hackett's April 27 PAA; (4) Dr. Ghazal's April 26 PAA; (5) Dr. Ghazal's September 1, 2006 letter; and (6) Dr. Hackett's September 1, 2006 memo.

36.     Dr. Taylor writes that the "activities reportedly performed by the claimant as noted in the OV notes of 4/11/06 appears contradictory to what the PAA of 4/27/2006 indicates."  Thus, Dr. Taylor concluded that the activities that Mr. Frank reported to Dr. Hackett contradicted Dr. Hackett's April 27 PAA and, therefore, the "medical information reviewed does not provide documentation of functional deficits which support L&Rs [limitations and restrictions] from 9/23/06 to present."

37.     Dr. Hackett's April 11, 2006 office notes read, in pertinent part:

11

> Jim is doing quite well. He unfortunately was doing some pruning, and then working with some redwood, and working out in the barn. He has some swelling of the tip of the first finger of the right hand. He gets clear liquid from this when he squeezes it. There is a little bit of redness. There is some swelling. He has no fevers. No other abnormalities.
>
> ***
>
> He is going off to South Lake Tahoe this afternoon for his niece's wedding. His niece is age 23, and she decided to get married on the beach in the snow. I will see patient again in 2 weeks time. He will continue with the same dose of Coumadin.

AR 132.

38.     Dr. Hackett's office notes indicate that Mr. Frank had ongoing and frequent office visits. Dr. Hackett treated Mr. Frank on December 12, 2005, January 9, 2006, February 6, 2006, March 6, 2006, April 4, 2006, and April 11, 2006. Dr. Hackett treated Mr. Frank for melanoma, a blood disorder, and deep vein thrombosis. AR 130-135.

39.     By declaration submitted in support of this court trial, Mr. Frank avers that Dr. Hackett's description of the activities in his April 11, 2006 office note:

> is inaccurate. I volunteered 2 or 3 times a month to help the Fresno County Mounted Patrol Unit; I would spend only 2 or 3 hours there. "Barn" refers to the Mounted Patrol Unit which keeps horses. My activities were limited to basically supervise working inmates, and I was provided with an electric cart so I did not have to stand or walk around. I spent most of the time driving or sitting in the cart, and I did not engage in any physical activities. I live in Fresno City and do not have any barn.
>
> Dr. Hackett's April 11th office visit note also inaccurately describes my trip to a wedding. In fact, my wife and I took my niece to another family member's wedding. And I was able to travel in a car as long as I took certain precautions with regard to my knees and blood disorder. To avoid possible blood clots in my legs and to ease the discomfort, my wife would drive, and I would lay down in back seat with my legs elevated to ease pain and minimize swelling. We took frequent breaks, about every hour or so, so I could walk around a bit to increase the circulation in my legs. But despite doing these things, on that occasion I had a lot of pain and swelling and therefore had to spend a lot of time lying down with my legs elevated.

40.     With his declaration, Mr. Frank submits a letter signed by Deputy Doug Richardson, Fresno County Sheriff's Office, Mounted Patrol Unit. Deputy Richardson:

> confirm[s] Jim Frank's volunteer service to the Fresno County Sheriff's Office...Mr. Frank was granted permission to volunteer with the mounted patrol unit with conditions, as it was disclosed from the outset by him that he had pronounced physical limitations.
>
> Mr. Frank served as an advisor to mounted patrol personnel regarding facility issues...Mr. Frank was given use of the facility golf cart while on site and was limited to giving verbal instructions...Mr. Frank rarely did more than walk very short distances when he was volunteering, and often had to retire to the office to rest and tend to his leg. His service in sharing his extensive knowledge has been invaluable to the mounted patrol unit.

1  41.     Dr. Taylor neither examined Mr. Frank nor contacted Drs. Ghazal or Hackett.

2  42.     Dr. Taylor's review and reliance on the February 8 Supplement was misplaced. As discussed in Finding of Fact 12, the February 8 Supplement was filled out by Dr. Ghazal's PA, was based on an examination of the left knee, and referred to the left knee. Dr. Ghazal's office informed LINA by letter that the February Supplement was erroneous and would be replaced.

6  43.     In addition, Dr. Taylor erred to rely on the June 26 PAA. As discussed in Finding of Fact 15, the June 26 PAA did not identify Mr. Frank and contradicted Dr. Ghazal's and Dr. Hackett's medical opinions. Dr. Taylor erred to give more weight to the June 26 PAA than he did gave to Dr. Ghazal's September 1, 2006 letter that repudiates and contradicts the L&Rs in the June 26 PAA, and Dr. Ghazal's March 29, 2009 office notes.

11 44.     Dr. Taylor and LINA failed to investigate the June 26 PAA.

12 45.     Dr. Taylor and LINA failed to investigate the meaning of Dr. Hackett's April 27, 2006 office notes.

14 46.     Dr. Taylor and LINA failed to consider Mr. Frank's administrative file as a whole to determine Mr. Frank's appeal.

### Affirmation of Denial

17 47.     Mr. Phipps' January 4, 2007 letter to Mr. Frank noted that LINA had completed its review, including Drs. Ghazal and Hackett's September 1, 2006 letters, and "must uphold our prior decision to deny your claim." AR 73.

20 48.     In his January 4, 2007 letter, Mr. Phipps wrote:

> To clarify your limitations and restrictions your medical records were reviewed by our Medical Director. Dr. Ghazal indicated on February 8, 2006 and June 26, 2006 that you are capable of medium work capacity. Dr. Hackett indicated April 27, 2006 that you are capable of sedentary capacity. However, your reported activities as noted in Dr. Hackett's office note of 4/11/06 appear contradictory to his assessment. Your medical record do not provide documentation of functional deficits which support you are precluded from light duty work. Therefore, the results of the transferable skills analysis remain valid.

25 AR 74.

26 49.     Based on Findings of Fact 12, 15, 18-20, 28-30, 32, 38, and 41-46, LINA erred to rely on the February 8 Supplement and June 26 PAA, to conclude that the results of the TSA analysis remained valid, and to disregard Dr. Ghazal and Dr. Hackett's September 1, 2006 letters.

**Post-denial**

50.    LINA did not respond to Mr. Frank's January 4, 2007 letter to request to "indicate what portion of Dr. Ghazal's report that says I can return to work."

51.    The February 14, 2007 letter of Mr. Frank's counsel to LINA noted the absence of a June 26, 2006 document from Dr. Ghazal that "Mr. Frank is capable of medium work capacity." Mr. Frank's counsel asked if the June 26 PAA was the document to which LINA referred. LINA's March 21, 2007 letter confirmed that it had referenced and relied upon the June 26 PAA.

52.    LINA has a continuing right to review Mr. Frank's claim for benefits. AR CD 11. Mr. Frank remains subject to the any occupation provision of the Plan. AR CD 21.

### ARGUMENTS

### Mr. Frank

The administrative record establishes that Mr. Frank's medical impairments did not materially change in 2006, as expressed in his medical records and as affirmed by his treating physicians.

No physician who has examined Mr. Frank has disputed or disagreed with the opinions of the treating physicians that Mr. Frank remains disabled.

The three medical reports used to deny Mr. Frank's claim–the February 8 Supplement, June 26 PAA, and the TSA–are discredited and provide no legitimate basis for withholding disability payments.

LINA failed to consider un-impeached medical evidence supporting Mr. Frank's claim.

LINA's handling and denial of Mr. Frank's claim reflects multiple breaches of their fiduciary duties by: arbitrarily refusing to credit un-impeached medical evidence and by ignoring the weight of the evidence; failing to undertake a reasonable investigation and by failing to apply a principled deliberative process; relying on "cherry-picked" information that is impeached and discredited by evidence in the administrative record; failing to consider all of Mr. Frank's impairments; and failing to engage in a meaningful dialogue with Mr. Frank.

### LINA

Because the evidence in the administrative record, provided by Mr. Frank's treating physicians, does not support disability beyond September 2006, Mr. Frank cannot meet his burden to prove that he meets the definition of total disability under the Plan.

1     Information obtained from Mr. Frank's two treating physicians–the February 8 Supplement and
2 the June 26 PAA–establish that Mr. Frank could return to work at a medium/manual activity level.
3     The medical records on file do not support the L&Rs claimed by Drs. Gazal and Hackett in their
4 September 1, 2006 letters, and no new medical records were provided to LINA during the course of the
5 appeal.  Accordingly, following a comprehensive review of Mr. Frank's file by LINA's medical director,
6 the decision to terminate benefits was upheld properly.
7     Neither September 1, 2006 letter, written by Drs. Ghazal and Hackett, demonstrated Mr. Frank's
8 inability to work in a sedentary position.

## CONCLUSIONS OF LAW

10     Under 29 U.S.C. §1132(a)(1)(B), a plaintiff may seek to "recover benefits due him under the terms
11 of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under
12 the terms of the plan."
13     In an ERISA action under the de novo standard of review, the plaintiff bears the burden of proving
14 that he or she is entitled to plan benefits. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63
15 F. Supp. 2d 1145, 1155 (C.D. Cal. 1999), *aff'd*, 370 F.3d 869 (9th Cir. 2004).  *See also, Horton v.*
16 *Reliance Standard Life Ins. Co.*, 141 F.3d 1028, 1040 (11th Cir.1998); *Farley v. Benefit Trust Life Ins.*
17 *Co.*, 979 F.2d 653, 658 (8th Cir. 1992).  Mr. Frank has the burden to prove that he is eligible for
18 continued long term benefits based on the terms and the conditions of the Plan. *Schwartz v. Metropolitan*
19 *Life Ins. Co.*, 463 F.Supp. 2d. 971, 982 (D. Ariz. 2006).  The Court considers whether Mr. Frank proved
20 by a preponderance of the evidence that he is disabled under the any occupation standard. *Id*.
21     Under the de novo standard of review, a court reviews the claim by interpreting the evidence
22 without deferring to any other party's interpretation. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,
23 112-13 (1989).  The Court's review is not affected by the decision made by the administrator nor the
24 conduct of either party. *Kearney*, 175 F.3d at1090 n.2 (9th Cir. 1999) (court in de novo review gives "no
25 deference at all" to the decisions of the insurers to den y benefits).  Instead, the Court places itself in the
26 position of the claim administrator and determines whether the evidence before it supports disability.
27 *Tremain v. Bell Industries*, 196 F.3d 970, 978 (9th Cir. 1999).
28     Having reviewed the administrative record and the parties' arguments, and based on this Court's

Findings of Fact, specially Findings of Fact 7, 12, 15, 18-20, 28-30, 32, 38, 41-46, and 49, this Court concludes that LINA erred to determine that Mr. Frank was ineligible for continued LTD benefits. Mr. Frank has carried his burden to prove that the administrative record establishes that Mr. Frank's medical impairments did not materially change in 2006, as expressed in his medical records and as affirmed by his treating physicians; no physician who has examined Mr. Frank has disputed or disagreed with the opinions of the treating physicians that Mr. Frank remains disabled; the three medical reports used to deny Mr. Frank's claim–the February 8 Supplement, June 26 PAA, and the TSA–are discredited and provide no legitimate basis for withholding disability payments; and LINA failed to consider un-impeached medical evidence supporting Mr. Frank's claim. The evidence in the administrative record supports the conclusion on this Court's de novo review that Mr. Frank suffers from knee injuries and a blood disorder, and that his physicians' continued medical opinions are that he is disabled.

Mr. Frank provides credible evidence that he remained disabled under the Plan. Drs. Ghazal and Hackett indicated in their September 1, 2006 letters that Mr. Frank remained disabled. Dr. Ghazal credibly repudiated the June 26 PAA and explained that the February 8 Supplement was a mistake. Dr. Ghazal's September 1, 2006 opinion was consistent with his opinion in his March 2006 office notes. Dr. Hackett's medical opinion remained consistent that Mr. Frank is disabled, and his letter explained that Mr. Frank remains disabled notwithstanding the activities reported in his April 11, 2006 office notes.

By contrast, LINA provided no evidence from a physician who has examined Mr. Frank to rebut Dr. Ghazal's and Dr. Hackett's opinions that Mr. Frank remained disabled. LINA chose not to have Mr. Frank undergo an independent medical evaluation. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005) (administrator's failure to conduct physical examination of a LTD claimant–especially where the right to do so is specifically reserved in the plan–raises questions about the thoroughness and accuracy of the benefits determination). LINA erroneously failed to investigate, and continued to rely on, documents that were discredited, repudiated, and sent in error. *See Glenn v. Metlife*, 461 F.3d 660, 666 (9th Cir. 2006) (administrator's termination of LTD benefits was arbitrary and capricious where, inter alia, the administrator's occupational skills analyst was provided with an inappropriately selective portion of the claimant's medical records); *see also, Watson v. Unumprovident Corp.*, 185 F. Supp. 2d 579 (Dist. MD 2002) (administrator's "failure to discover erroneous records is positive proof that [claimant's]

ERISA rights suffered the very harm the two-pronged standard of review–procedural integrity and substantial evidence to support the plan administrator's adverse decision–is designed to avoid."). LINA relied on erroneous information to refer Mr. Frank for a TSA, to conclude that Mr. Frank qualified for three "light duty" occupations, and to conclude that Mr. Frank was ineligible for LTD benefits; however, LINA may not "deny claims based only on the unsupported conclusions of its employees." *Curtin v. UNUM Life Ins. Co. Of Am.,* 298 F. Supp. 2d 149, 157 (D. Me. 2004); *see also, Calvert*, 409 F.3d at 297 (administrator cannot simply dismiss claimants's documented functional limitations when the individual making that credibility determination "never met or examined" the claimant). LINA erred to disregard the opinions of Drs. Ghazal and Hackett in their September 1, 2006 letters. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L. Ed. 2d 1034 (2003) (While nothing in ERISA suggests that a plan administrator must accord special deference to the opinions of treating physicians, a claimant's reliable evidence, including the opinions of a treating physician, may not be arbitrarily discredited.).

In addition, LINA failed to have a "meaningful dialogue" with Mr. Frank in deciding whether to discontinue LTD benefits. *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). LINA "was required to give [Mr. Frank] 'a description of any additional material information' that was 'necessary' for [him] to perfect the claim, and to do so 'in a manner calculated to be understood by the claimant.'" *Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 511 F.3d 1206, 1213 (9th Cir. 2008) (citing *Booton*, 110 F.3d at 1463) (quoting 29 C.F.R. §2560.503-1(g)). LINA ignored Mr. Frank's written inquiry regarding what LINA relied on to determine that he could return to work. LINA sought no clarification regarding the perceived discrepancy between Dr. Hackett's April 11 office notes and his April 27 PAA. Furthermore, LINA cited that discrepancy for the first time in its affirmation of its denial of Mr. Frank's appeal without considering Dr. Hackett's explanation or without giving Mr. Frank the chance to submit further evidence to support his disability claim:

> [T]he fact that the claims administrator presented a new reason at the last minute bears on whether denial of the claim was the result of an impartial evaluation or was colored by [the administrator's] conflict of interest. After all, coming up with a new reason for rejecting the claim at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation.

*Saffron*, 511 F.3d at 1215.

Based on the foregoing findings of fact and conclusions of law, LINA erred to determine that Mr. Frank was ineligible for continued LTD benefits.

### ERISA RELIEF AND ATTORNEY FEES[2]

#### Reinstatement

The principal relief under 29 U.S.C. §1132(a)(1)(B), section 502(a)(1)(B) of ERISA, is an order to reinstate benefits and to award retroactive benefits. No extra-contractual compensatory damages or punitive damages are allowed. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 215 (2004). Accordingly, this Court orders LINA to reinstate LTD benefits to Mr. Frank, to begin with the benefit payable beginning immediately after final entry of judgment by this Court.

#### Past Benefits

When an administrator wrongfully terminated disability benefits, the Court may order the insurer to retroactively reinstate benefits effective to the date on which it discontinued them through approximately the date of final judgement. *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001). Mr. Frank submits that the total amount of unpaid benefits from the time of the wrongful termination through the present–September 2006 through June 2009–is $33,420.00. LINA fails to oppose Mr. Frank's submission or request. Accordingly, this Court awards Mr. Frank $33,420.00 for past unpaid benefits.

#### Pre-judgment Interest

Mr. Frank seeks an award of pre-judgment interest to compensate him for the loss of value of money wrongly withheld from him. "A district court may award prejudgment interest on an award of ERISA benefits at its discretion." *Blankenship v. Liberty Life Assur. Co.*, 486 F.3d 620, 627 (9th Cir. 2007). An award of interest on delayed benefits payments may be "appropriate equitable relief" without any showing of bad faith. *Grosz-Salomon,* 237 F.3d at 1163; *see also, Rabuch v. Hartford Life & Accident Ins. Co.*, 522 F. Supp. 2d 844, 882 (W.D. Mich. 2007). This Court has discretion to award pre-judgment interest in an ERISA case in accordance with general equitable principles. *See Ford v. Uniroyal Pension*

---

[2] In Defendants' Response to Plaintiff's Opening Brief, Defendants failed to address or oppose Mr. Frank's request for past benefits, 10% interest, future LTD benefits, and life insurance premiums. LINA argued only that Mr. Frank is not entitled to an award of attorneys' fees. Accordingly, this Court finds Mr. Frank's request for relief to be unopposed, with the exception of attorneys fees request.

*Plan*, 154 F.3d 613, 616 (6th Cir. 1998).

"Generally, the interest rate prescribed for post-judgement interest under 28 U.S.C. §1961 is appropriate for fixing the rate of pre-judgement interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Blankenship*, 486 F.3d at 628. Mr. Frank submits that a rate of 10% is reasonable and should be applied to the LTD benefits wrongfully withheld by defendants. Mr. Frank fails to provide "substantial evidence" to support his position that this Court should deviate from the general rule of using the interest rate as described in 28 U.S.C. §1961. Accordingly, this Court awards Mr. Frank pre-judgment interest in accordance with the rate proscribed in 28 U.S.C. §1961. Mr. Frank shall file a calculation of prejudgment interest based on the statutory standard to calculate Mr. Frank's total past benefits award.

**Future Benefits**

Mr. Frank requests this Court to award him with on-going monthly LTD benefits of $1,013.00 until July 22, 2013. Mr. Frank submits that the total of such payments is $54,702.00, "the present value of which is $45,791.00 applying a Four Percent (4%) discount rate."

This Court concluded that LINA erred to discontinue Mr. Frank's LTD benefits in September 2006, and ordered LINA to reinstate Mr. Frank's LTD benefits. The Court notes, however, that under the Plan, LINA has a continuing right to review Mr. Frank's claim for benefits and Mr. Frank remains subject to the any occupation provision of the Plan. In addition, Mr. Frank has not sustained his burden to prove that he will remain totally disabled through July 22, 2013. Accordingly, this Court cannot award Mr. Frank future benefits in a lump sum. This Court shall order LINA to pay Mr. Frank on-going monthly LTD benefits through July 22, 2013, but notes that Mr. Frank must continue to remain eligible for benefits pursuant to the any occupation provision of the Plan.

**Life Insurance Premiums**

In addition to LTD benefits, Mr. Frank qualified for a waiver of life insurance premiums during the time he was disabled under the Plan. When LINA's erroneously determined that Frank was no longer disabled, LINA also terminated Mr. Frank's waiver of premiums, based on the erroneous L&Rs of the June 26 PAA. AR 98-101. LINA advised Mr. Frank that if his appeal of the denial "is granted, your conversion policy will be cancelled as of its effective date and any premium paid will be refunded." AR

100. Since August 2006, Mr. Frank paid $18,189.50 for life insurance premiums. This Court awards Mr. Frank $18,189.50 for past premiums and orders LINA to reinstate Mr. Frank under the life insurance premium waiver program during such time as Mr. Frank is disabled.

### Attorneys Fees

ERISA provides that "the court in its discretion may allow reasonable attorney's fees and costs of action to either party." 29 U.S.C. §1132(g)(1). Mr. Frank requests that this Court award attorneys' fees "in an amount to be determined by the Court in a subsequent proceeding." Mr. Frank may apply for costs and move for attorney's fees, which this Court shall consider separately, as allowed by Fed. R. Civ. P. 54(d).

### CONCLUSION AND ORDER

For the reasons discussed below, this Court:

1. RULES in favor of Plaintiff Mr. Frank to find and conclude that defendant LINA erroneously terminated Mr. Frank's LTD benefits effective September 2006;
2. ORDERS LINA to reinstate Mr. Frank's LTD and life insurance benefits;
3. AWARDS Mr. Frank past LTD benefits in the amount of $33,420.00 plus pre-judgment interest, and $18,189.50 to reimburse Mr. Frank for past premiums paid;
4. ORDERS Mr. Frank, **no later than July 8, 2008**, to file a:
    1. Calculation of prejudgment interest based on 28 U.S.C.; and
    2. Proposed judgment.
5. ORDERS LINA, **no later than July 15, 2009**, to file an opposition, if any, to Mr. Frank's calculation of pre-judgment interest and proposed judgment.

IT IS SO ORDERED.

**Dated:   June 25, 2009**              /s/ Lawrence J. O'Neill
                                          UNITED STATES DISTRICT JUDGE